Kelly *v.* Prudential Insurance Company of
America, Appellant.

144

Argued January 24, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*A. A. Vosburg,* with him *A. Floyd Vosburg,* of *Vosburg & Vosburg,* for appellant.

*Paul A. McGlone,* with him *Frank J. McDonnell,* for appellee.

OPINION BY MR. JUSTICE MAXEY, March 22, 1939:

This is an appeal by defendant insurance company from a judgment for the plaintiff, as the beneficiary of four life insurance policies, in a suit to recover the benefits of double indemnity for the accidental death of the insured and also, in the case of all but one of the policies, the face amounts thereof. The provision under which the suit was brought, applicable by agreement of the parties to all the policies, was that the company should be liable for double indemnity in case "the death of the insured occurred . . . as a result, directly and independently of all other causes, of bodily injuries, effected solely through external, violent and accidental means, of which . . . there is a visible contusion or wound on the exterior of the body . . .; provided, however, that no accidental death benefit shall be payable if the death of the insured resulted . . . directly or indirectly from bodily or mental infirmity or disease in any form." The principal question is whether the proof offered by appellee, the beneficiary, was sufficient to establish her right to recover the accidental death benefits alleged to have accrued under the foregoing clause in the policies. The court below overruled appellant's motions for a new trial and for judgment n. o. v., and entered judgment on the verdict.

The insured, Mrs. Catherine Daley, was some sixty years of age when she died on November 25, 1935. The policies had been taken out some seven years before. Neither party in the case disputed the fact that Mrs. Daley died from a fall sustained as she descended a flight of steps leading down to the unlighted cellar in her home, where she lived alone in Scranton, on the

afternoon of October 22, 1935. There were no eyewitnesses to the occurrence, for at the time Mrs. Daley was alone in the house. The real questions in the case are, first, whether the fall was the result of her tripping on the steps, and hence of an accident, or was occasioned by an attack of vertigo or dizziness incidental to a chronic condition of arteriosclerosis; and, second, whether, if the fall was accidental, the death which ensued was the result of the fall alone or of the combined effect of the fall and of the preëxisting arteriosclerotic condition.

Appellee's witnesses were herself, two neighbors and two physicians who examined and treated Mrs. Daley after the fall occurred. One of the neighbors testified merely that she observed Mrs. Daley on the morning of October 22nd returning home from Mass at 8:30 a. m., saw her again at 4 or 4:30 p. m., and she appeared to be in good health, moving actively about without the appearance of suffering from any ailment. The other neighbor said she accompanied appellee to Mrs. Daley's home shortly after 6 p. m. when the latter was called to the scene. By that time Mrs. Daley had been placed in bed, but was conscious, and was suffering from cuts or wounds on her head, side and arm. This witness testified that she went down to the cellar steps and there found one of Mrs. Daley's shoes, both of which had slipped off her feet as she fell. Immediately at the foot of the steps was a commode or toilet which was broken in pieces, covered with bloodstains. The fair inference was that when Mrs. Daley fell her body or head struck the commode and broke it.

Appellee's version of the events succeeding the occurrence was that at about 6 or 6:30 p. m. she was called to Mrs. Daley's home, where she found her reclining on a couch in a semiconscious state. She called a doctor and Mrs. Daley was treated. The next morning, before Mrs. Daley was taken to a hospital for treatment, she said to the witness that "she did not know what happened but

as far as she knew, she tripped and fell down the step, the second step from the bottom."

However, on motion of counsel for appellant, these declarations of the deceased insured were stricken from the record and the jury was instructed to disregard them. Appellee further testified that the next day she examined the stairway and found one of Mrs. Daley's shoes wedged in one of the steps. On October 23rd Mrs. Daley was taken to the hospital for observation and treatment, but at that time was still able to walk and carry on a conversation.

The physician who first treated Mrs. Daley, at her home, stated that he found her in a semicomatose condition, suffering from a wound on the right temporal region of her head and lacerations on her left arm and both knees and legs. She was too dazed to give a coherent account of what had occurred and was unable to respond to questions. Her injuries were such as could have been caused by a fall and might have resulted in death to a woman of her age. He diagnosed her condition by a digital examination as concussion and probable fracture of the skull. Dr. O'Brien was the interne who first treated Mrs. Daley when she was admitted to the Scranton State Hospital. Testifying from his records, he said that Mrs. Daley's symptoms, in addition to the visible external wounds, were a headache and weakness in her left arm and leg. Mrs. Daley told him at the hospital that her fall was the result of an attack of vertigo or dizziness, which, coupled with other symptoms, he diagnosed as indicative of a heart disorder. He made an x-ray examination, which disclosed a fractured skull, as a result of which Mrs. Daley died.

The evidence submitted by appellant developed certain conflicts with that of appellee and was opposed to appellee's contention that death resulted from accidental causes without the contributing factor of disease. Several witnesses testified that before the fall Mrs. Daley was in poor health, unable to do much housework, and

required the assistance of neighbors and friends to perform her daily tasks. One of the physicians who treated Mrs. Daley during her hospitalization stated that she admitted having had spells of dizziness and a heart ailment prior to October 22nd, and that the fall was the result of one of these. Another testified that the cause of death was fracture of the skull with the contributing cause of arteriosclerosis, a common complaint of the later years of life. The party who first went to Mrs. Daley's assistance just after the fall told of her dazed condition when he found her in the cellar in absolute darkness and of his efforts, which were finally successful, to carry her upstairs for first-aid treatment, upon which he summoned appellee and others to assist her.

The foregoing was sufficient, in our opinion, to take to the jury both of the basic questions in the case. There was evidence from which it could be legitimately inferred that the fall which Mrs. Daley sustained was the result of a misstep which she made in the dark on the stairway, without giving any consideration to the afterwards excluded declaration made to appellee that this was what occurred. It is true that appellee's evidence afforded also the contrary inference, that the fall was the result of an attack of vertigo, but this rested solely on the testimony of a physician, reading from his hospital record, that he had been so informed by the insured while seriously afflicted. Such conflict as there was, was for the jury to reconcile, as by its verdict it did: *Cuteri v. West Penn Rys. Co.*, 305 Pa. 347, 157 A. 686; *Dougherty v. Brandt et al.*, 122 Pa. Superior Ct. 410, 186 A. 419; *Jenkins et ux. v. Beyer et al.*, 118 Pa. Superior Ct. 527, 180 A. 135. The case is not comparable to *DeReeder et al. v. Travelers Ins. Co.*, 329 Pa. 328, 333, 198 A. 45, where "there were no facts or circumstances from which the jury could infer legitimately *to the exclusion of other inferences equally plausible* that the insured's death resulted from an accident." There was indeed stronger evidence in favor of an accidental cause of

death than in *Wainstein v. Equitable Life Assurance Society,* 318 Pa. 428, 178 A. 502, and *Pomorskie v. Prudential Ins. Co. of America,* 318 Pa. 185, 177 A. 783, in which latter case the jury was permitted to infer merely from the fall which the insured sustained, without more, that it was the result of an accident.

On the second question presented, whether death resulted in part from the contributing cause of arteriosclerosis, it is sufficient to say that this issue was brought into the case by the physician who testified for the defense, and not in appellee's evidence. The physicians who examined and treated Mrs. Daley and who gave their opinions as to her condition both diagnosed it as fracture of the skull resulting from a fall, and one of them testified that this was the cause of her death. Neither of them touched upon the alleged sclerotic condition of their patient or attributed death to it as a factor in whole or in part. The issue as to the cause of death was thus squarely before the jury for it to determine, and was so presented to it by the trial judge in a charge paraphrasing the expressions used by the lower court, and adopted by this court on appeal, in *Kelley v. Pittsburgh Casualty Co.,* 256 Pa. 1, 5, 100 A. 494.

It is contended, however, that the charge of the trial judge was erroneous as to the effect of a preëxisting pathological condition of body amounting to a contributing cause of death, and permitted the jury to find that the preëxisting arteriosclerosis, to which appellant's witnesses testified, though a contributing cause of the death, was insufficient to eliminate liability under the policies. The jury was instructed: "The law is that if a disease, while existing, be but a condition and the accident the moving, sole and proximate cause of the death, the exception in the policy will not relieve the insurer for death so caused. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease and low

vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury. Where accidental injury aggravated a disease, and thereby hastened death so as to cause it to occur at an earlier period than it would have occurred but for the accident, it is the direct, independent, and exclusive cause of death at that time. In other words, it is seldom that an accident immediately causes death. It is where usually, some other conditions arose, due to low vitality or something of that sort that a doctor will say there was another symptom that occurred at the time of the death, but if the accident was the real cause, from which there is a chain of events to the death, then the accident was the cause of the death. Thereupon you have a right to find that the accident was the cause of death in this case and the plaintiff would be entitled to recover the double indemnity, if you believe her testimony."

Although only a general exception was taken to the charge, nevertheless, appellant submitted a request for instruction to the jury which controverted the principle of law expressed in the foregoing, and read as follows: "There can be no recovery in this case for 'Double Indemnity' unless the jury find, (a) that the death of the insured was due to accidental means; (b) that the death was due solely and entirely to accidental means, and not contributed to by disease; (c) and that it was not due, either directly or indirectly, by disease or bodily infirmity."

The portion of the charge quoted above was a correct statement of the applicable law, and we adhere to the principles laid down by this court in *Kelley v. Pittsburgh Casualty Co.*, supra, where it was said, at page 7: " 'The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease or low vitality do not arise to the

dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury. . . . Where accidental injury aggravated a disease, and thereby hastened death so as to cause it to occur at an earlier period than it would have occurred but for the accident, it is the direct, independent, and exclusive cause of death at that time. . . . The phrase "resulting directly, independently, and exclusively in death," refers to the efficient, or, as some courts speak of it, the predominant cause of death at the time it occurs. In other words, it means the proximate cause. . . . It must be remembered that the policy is couched in language, chosen by the insurer, and must be given the construction, of which it is susceptible, most favorable to the assured. . . . Moreover, it is the duty of courts to give such construction to a policy, if the language used fairly admits, as will make it of some substantial value and carry out the intention expressed therein that liability is incurred where death occurs from accidental injury. If liability is to depend upon the physical condition of the assured as contributing in some degree to death, then it should be so stated plainly in the policy. We are of the opinion that the language of this policy does not mean that there shall be no liability in case death results from the aggravation of a preëxisting disease.' "

It is clear that if the physical condition of the insured is merely weakened or his resistance to disease lowered by a preëxisting ailment or disease incident to advancing age, which creates a bodily condition of a passive nature not alone sufficient to cause death, this fact will not prevent recovery for death resulting from accidental means under an insurance policy providing indemnity therefor, even though death resulting indirectly from bodily or mental infirmity or disease is excluded as a risk, provided the accident sets in progress the chain of events leading directly to death. The instruction com-

plained of does not conflict with any expressions in the cases of *Arnstein v. Metropolitan Life Ins. Co.*, 329 Pa. 158, 196 A. 491, and *Ewing v. Equitable Life Assurance Society*, 320 Pa. 577, 182 A. 369. For additional authorities see annotations in 3 A. L. R. 1304 and 82 A. L. R. 1411, and the cases there cited, and also *Preferred Accident Ins. Co. v. Combs*, 76 F. (2d) 775. Defendant's request for charge, as quoted above, was properly refused.

The further contention that appellee showed no right to recover on the policies because she had no insurable interest was properly dismissed by the court below. It was not disputed that the policies were originally applied for by and issued to the insured. Sometime after their issuance she became unable to pay the premiums as they fell due. One of the policies was known as an "ordinary life policy," the others being designated "industrial policies." In the ordinary life policy a change of beneficiary was expressly permitted and this was done by the insured; she changed the name of the beneficiary from that of her daughter to that of appellee and this fact was endorsed on the policy. As to the industrial policies, in each case the insured signed printed blanks or forms whereby the company was "requested and authorized" to pay the proceeds of the policies to appellee. This was done in the presence and at the direction of the local agent of appellant who had issued the policies, and the executed blanks thereafter remained in appellant's files. From that time until the date of the insured's death the premiums were paid by appellee. There can be no question that as to the ordinary life policy the change of beneficiary, endorsed on the policy, was effective to vest in appellee the right to the proceeds thereof on the death of the insured. No question as to appellee's insurable interest could arise in respect to this policy. As to the other policies, it is apparent that what both the insured and appellant sought to do was just what was done in the case of the ordinary life policy—that is, effect a change of beneficiary. This was the ob-

vious intent of the parties: *Myers v. Eckerson et al.*, 288 Pa. 468, 136 A. 785. By acquiescence and acceptance of premiums from appellee over a number of years, appellant is now in no position to complain that appellee had no insurable interest which entitles her to maintain a suit on the policies. In any event the usual rule applies, that if the party to whom the policies were issued *then* had an insurable interest, it is unnecessary for the beneficiary to prove an insurable interest *at the maturity of the policies: Montgomery's Est.*, 299 Pa. 452, 149 A. 705; *Szymanski's Est.*, 109 Pa. Superior Ct. 555, 167 A. 420; *Pashuck, Admr., v. Metropolitan Life Ins. Co.*, 124 Pa. Superior Ct. 406, 188 A. 614.

The forms designating appellee as beneficiary of the industrial policies were signed by the insured by mark and witnessed by the signature of a third party in the presence of appellant's agent, who prepared the forms and wrote the name of the insured at the place where she signed by mark. Appellee called the agent as a witness and he so testified, but the subscribing witness was not called to testify and it was not proved that she was beyond the reach of subpœna or otherwise unavailable. We are of opinion, however, that the instruments were properly received in evidence, notwithstanding the principle applied in *North Penn Iron Co. v. International Lithoid Co.*, 217 Pa. 538, 66 A. 860, since the party who prepared the papers and in whose presence the insured affixed her signature by mark, identified the papers and authenticated their execution, and there was no denial of their execution by appellant in the pleadings or notice given that strict proof of execution would be required: see 2 Wigmore on Evidence (2d ed.) 945, sec. 1290. There was no legal requirement that the papers in question be attested by any subscribing witness.

The trial judge refused to permit certain witnesses for appellant to give their estimates of the age of the insured, for the purpose of impeaching her age as stated therein. The specific defense averred was that at the

154

time when the policies were issued the insured was past the age of insurability, and the object of the excluded testimony was to defeat appellee's claims in toto. However, the policies were, by express provision, incontestable after one year from the date of issuance, except to adjust the amount of insurance in accordance with the true age of the insured. The averment being that she was not insurable at all, and the policies providing that each should constitute the whole contract between the parties, the case falls directly within the ruling of *Mitchell v. Penna. Mut. Life Ins. Co.*, 90 Pa. Superior Ct. 426; see also *Sipp v. Phila. Life Ins. Co.*, 293 Pa. 292, 142 A. 221. The evidence offered was inadmissible to impeach the policies on the grounds averred.

The assignments of error are overruled.

The judgment is affirmed.